JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IAN MCCORMICK** and **JOSH BLAKELEY** on behalf of themselves and all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| The **AUSTRALIAN FOOTBALL LEAGUE**, an Australian Public Company, **FOX SPORTS AUSTRALIA PTY LIMITED**, an Australian Private Company, and **FOX SPORTS STREAMCO PTY LIMITED**, an Australian Private Company, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1        Plaintiffs Ian McCormick and Josh Blakeley, on behalf of themselves and all others similarly

2 situated, allege the following based upon personal knowledge, or, where applicable, information, belief,

3 and the investigation of counsel:

4 **NATURE OF THE ACTION**

5       1.    This is a class action suit brought on behalf of all persons with Meta Platforms Inc.

6 ("Meta") (formerly known as Facebook) ("Meta" or "Facebook") accounts who subscribe or have

7 subscribed during the relevant period to Watch AFL and viewed videos on www.watchafl.com.au.

8       2.    Watch AFL is a partnership, operated jointly by Defendants, which offers a video-

9 streaming service providing access to live streams and on-demand prerecorded videos of Australian

10 Football League games, highlights, and related shows through the Watch AFL website –

11 www.watchafl.com.au – and various dedicated apps.

12       3.    Watch AFL makes money by offering paid subscriptions in exchange for access to its

13 live streams and library of prerecorded videos.

14       4.    Plaintiffs and other Class Members must subscribe to Watch AFL to watch prerecorded

15 videos at www.watchafl.com.au. A basic subscription costs AUD $24 per week, AUD $44 per month,

16 or AUD $229 per year.[1] See Figure #1 below:



27       5.    Plaintiffs bring this action in response to Watch AFL's practice of knowingly disclosing

---

[1] *See* https://www.watchafl.com.au (Last visited August 5, 2024)

its subscribers' personally identifiable information – including a record of every video clip they view– to Facebook without consent.

6.     The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape providers." S. Rep. No. 100-599, at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

7.     Watch AFL violates the VPPA by knowingly transmitting Plaintiffs' and other Class Members' personally identifiable information -- including a record of every prerecorded video they watched ("Personally Identifiable Information" or "PII")—to a third party, Meta Platforms Inc. ("Meta") (formerly known as Facebook) ("Meta" or "Facebook"), without Watch AFL's subscribers' consent.

## **PARTIES**

8.     Plaintiff McCormick is, and has been at all relevant times, a resident of Henrico, Virginia. In or about March 2023, McCormick signed up for a service that Watch AFL describes as a "12-Month Subscription,"[2] by agreeing to pay an annual amount in exchange for access to Watch AFL's live streams and library of prerecorded videos. Since he first subscribed to Watch AFL's services, McCormick has viewed, and continues to view, dozens of pre-recorded videos on Watch AFL's website – www.watchafl.com.au – using his personal computer. Throughout the time that McCormick has subscribed to Watch AFL's services, he has also had a Facebook account and has used that account on his personal computer.

9.     Plaintiff Blakeley is, and has been at all relevant times, a resident of El Cajon, California. In or about September 2022, Blakeley signed up for a service that Watch AFL describes as a "Monthly Subscription,"[3] by agreeing to pay a monthly amount in exchange for access to Watch AFL's live streams and library of prerecorded videos. Since he first subscribed to Watch AFL's services, Blakeley has viewed, dozens of pre-recorded videos on Watch AFL's website –

---

[2] *Id.*
[3] *Id.*

www.watchafl.com.au – using his personal computer. Throughout the time that Blakeley has subscribed to Watch AFL's services, he has also had a Facebook account and has used that account on his personal computer.

10.     Defendant the Australian Football League (the "AFL") is an Australian Public Company headquartered in Melbourne, Australia.

11.     Defendant Fox Sports Australia Pty Limited ("Fox Sports") is an Australian Private Company headquartered in Artarmon, New South Wales, Australia.

12.     Defendant Fox Sports StreamCo Pty Limited ("StreamCo") is an Australian Private Company headquartered in Artarmon, New South Wales, Australia. StreamCo is a wholly-owned subsidiary of Fox Sports.

13.     Defendants operate a partnership, doing business as Watch AFL, a video-streaming service offering access to live streams and on-demand prerecorded videos of Australian Football League games, highlights, and related shows through the Watch AFL website – www.watchafl.com.au – and various dedicated apps. As Watch AFL describes itself: "Watch AFL is a subscription-based international service that delivers LIVE streams and on demand replays of the Australian Football League to fans around the world."[4]

14.     Through their partnership, Watch AFL, each Defendant was and is directly involved in and jointly responsible for Watch AFL's conduct as described in this Complaint. Moreover, at all relevant times, each Defendant knew or realized, or should have known or realized, that the other Defendants were engaged in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

## JURISDICTION

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

---

[4] https://www.watchafl.com.au/

§ 1331, because this suit is brought under the laws of the United States, *i.e.*, the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*

16.    This Court has specific jurisdiction over Defendants because Defendants have purposefully and differentially directed and targeted the U.S. market, by and through the following actions described in subparagraphs (a)-(e):

(a)    Out of Watch AFL's five server facilities, three are located within the United States, which on information and belief, provides Watch AFL's U.S. customers with reduced latency and improved website performance as compared to Watch AFL's non-U.S. based customers.[5]

(b)    Data from August 2024 shows that the majority of Watch AFL's traffic comes from the United States.[6]

(c)    Watch AFL is an <u>international</u> service – "the content within the Service can only be viewed from outside Australia (for example, if you are living, working or holidaying outside of Australia),"[7] and, on information and belief, Watch AFL engages in significant, long-term business activity purposefully directed toward the United States, by, *inter alia*, the maintenance of its interactive websites directed at and accessible to residents of the United States.

(d)    Defendant's activities in the Unites States are continuous and systematic, and Defendant directs substantial business activity into this forum.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving raise to the claims asserted in this action occurred in the judicial district where this action is brought.

## FACTUAL BACKGROUND

### I.    The VPPA

18.    The origins of the VPPA begin with President Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history. Congress responded by passing the VPPA, with an eye on the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

---

[5] See https://dnsmap.io/#A/www.watchafl.com.au
[6] Id.
[7] https://www.watchafl.com.au/

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think this is wrong.

S. Rep. No. 100-599, at 5-6 (1988) (internal ellipses and brackets omitted).

19.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710 (b)(1). The VPPA defines "personally identifiable information" as including "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.     The Meta Tracking Pixel

20.     Meta, which operates Facebook and was called Facebook, Inc. until changing its name to Meta in January 2022, is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[8] and reported $116.61 billion in revenue in fiscal year 2022.[9]

21.     Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue

---

[8] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf
[9] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited 6/6/2023).

from selling advertising placements on our family of apps to marketers."[10] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[11]

22.     Facebook describes itself as a "real identity platform,"[12] meaning users are allowed only one account and must share "the name they go by in everyday life."[13]  Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender.[14]

23.     Facebook sells advertising space by highlighting its ability to target users.[15] Facebook can target users so effectively because it surveils user activity both on and off its site.[16] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[17] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[18]

24.     Advertisers can also build "Custom Audiences".[19] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers

---

[10] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022,
https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited June 19, 2022).
[11] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018.
https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm
[12] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[13] Facebook, Community Standards, Part IV Integrity And Authenticity,
https://www.facebook.com/communitystandards/integrity_authenticity.
[14] Facebook, Sign-Up, http://www.facebook.com/
[15] Facebook, Why Advertise On Facebook, https://www.facebook.com/business/help/205029060038706.
[16] Facebook, About Facebook Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[17] Facebook, Ad Targeting: Help Your Ads Find The People Who Will Love Your Business,
https://www.facebook.com/business/ads/ad-targeting.
[18] Facebook, Easier, More Effective Ways To Reach The Right People On Facebook,
https://www.facebook.com/business/news/Core-Audiences.
[19] Facebook, About Custom Audiences,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

or people who have visited [their] website."[20] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[21] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[22] One such Business Tool is the Meta Tracking Pixel.

25.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[23] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

26.     Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[24] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[25]  An advertiser can also create their own tracking parameters by building a "custom event."[26]

---

[20] Facebook, About Events Custom Audience,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[21] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[22] Facebook, Create A Customer List Custom Audience,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494.
[23] Facebook, Retargeting, https://www.facebook.com/business/goals/retargeting.
[24] *See* Facebook, Facebook Pixel, Accurate Event Tracking, Advanced,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Facebook, Best Practices For Meta Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[25] Facebook, Specifications For Facebook Pixel Standard Events,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[26] Facebook, About Standard And Custom Website Events,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

27.     Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[27] Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[28] Pixel-specific Data includes "the Pixel ID and cookie."[29]

28.     FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms.  . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[30]

**III.     Watch AFL and The Meta Pixel**

29.     On information and belief, Watch AFL hosts and delivers many thousands of pre-recorded videos.

---

[27] Facebook, Facebook Pixel, https://developers.facebook.com/docs/facebook-pixel/.

[28] *Id.*

[29] *Id.*

[30] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019
https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf

30.     Watch AFL hosts the Meta Tracking Pixel and transmits two distinct events to Facebook,[31]  see Figure #2 below:



31.     The Button Click event— is sufficient to permit an ordinary person to identify a specific individual's video viewing behavior.

---

[31] This data derives from a tool created and offered by Facebook.

32.     The Button Click event transmits the Uniform Resource Locator ("URL") accessed, which shows the video the visitor viewed, See Figure #3 below:

### Meta Pixel Helper
Learn More

One pixel found on www.watchafl.com.au

**Meta Pixel**
Pixel ID: 337188076923470 click to copy

Troubleshoot Pixel

Set up events

▶ ✅ PageView

▼ ⚡ Button Click Automatically Detected ⓘ

**CUSTOM PARAMETERS SENT**

**buttonFeatures:** Hide

    {"classList":"fiso-hawk-match-video__video-action-btn fiso
    -hawk-match-video__video-action-btn--start","destinatio
    n":"","id":"","imageUrl":"","innerText":"Play from Star
    t","numChildButtons":0,"tag":"button","type":null,"nam
    e":"","value":""}

**buttonText:** Play from Start
**formFeatures:** []
**pageFeatures:** Hide



    {"title":"Collingwood Magpies vs. Western Bulldogs | AFL L
    ive Scores"}

**EVENT INFO**

**URL called:** Show
**Load Time:** 36.33 ms
**Pixel Location:** Show

▶ ⚠️ agent

33.     The Button Click event registers every time a visitor watches a video, see Figure #4 below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Meta Pixel Helper**
Learn More

CUSTOM PARAMETERS SENT

**buttonFeatures:** Hide

{"classList":"fiso-hawk-match-video__video-action-btn fiso
-hawk-match-video__video-action-btn--start","destinatio
n":"","id":"","imageUrl":"","innerText":"Play from Star
t","numChildButtons":0,"tag":"button","type":null,"nam
e":"","value":""}

**buttonText:** Play from Start
**formFeatures:** []
**pageFeatures:** Hide



{"title":"Collingwood Magpies vs. Western Bulldogs | AFL L
ive Scores"}

EVENT INFO

**URL called:** Hide

https://www.facebook.com/tr/?id=337188076923470&ev=Subscri
bedButtonClick&dl=https%3A%2F%2Fwww.watchafl.com.au%2Fmatc
h-centre%2F4335&rl=https%3A%2F%2Fwww.watchafl.com.au%2Fmat
ch-centre%2F&if=false&ts=1717433924172&cd[buttonFeatures]
=%7B%22classList%22%3A%22fiso-hawk-match-video__video-acti
on-btn%20fiso-hawk-match-video__video-action-btn--start%2
2%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22im
ageUrl%22%3A%22%22%2C%22innerText%22%3A%22Play%20from%20St
art%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22butto
n%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%2C%22value%
22%3A%22%22%7D&cd[buttonText]=Play%20from%20Start&cd[formF
eatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22Colli
ngwood%20Magpies%20vs.%20Western%20Bulldogs%20%7C%20AFL%20
Live%20Scores%22%7D&sw=1920&sh=1080&v=2.9.156&r=stable&a=t
mgoogletagmanager&ec=1&o=4126&fbp=fb.2.1716576784376.36127
9305&ler=other&cdl=API_unavailable&it=1717433921459&coo=fa
lse&es=automatic&tm=3&rqm=GET

**Load Time:** 36.33 ms
**Pixel Location:** Show

⚠ agent

//

34.    The button text is sufficient to permit an ordinary person to identify what video an

individual has viewed.

35.    A visitor who is logged into Facebook while watching a video on Watch AFL will transmit the c_user cookie to Facebook. The c-user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video, for example, Watch AFL compels the browser to send multiple cookies, which are visible in Figure #5 below:

| Name ▲ | Value |
|---|---|
| c_user | 10000█████████ ← |
| datr | saFWZXu696kRJfnBDt3cUDkn |
| fr | 12ku163EnBwCtjWps.AWX0k1uyp6JGlDbA… |
| presence | EDvF3EtimeF1717420984EuserFA21B0311… |
| ps_n | 1 |
| sb | saFWZTYcT89vhNpJu_mc48fL |
| usida | eyJ2ZXIiOjEsImlkIjoiQXNlaWFpZTNtb2F3Y… |
| xs | 9%3AdXxBtLEXwuwdrA%3A2%3A1716322… |

36.    When a visitor's browser has recently logged out of Facebook, Watch AFL compels the browser to send a smaller set of cookies, see Figure 6 below:

| datr | saFWZXu696kRJfnBDt3cUDkn | . |
| fr | 12ku163EnBwCtjWps.AWX0k1uyp6JGlDbA… | . |

37.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[32] The datr cookies also identifies a browser.[33] Facebook, at a minimum, uses the fr cookies to identify users.[34]

38.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses the cookie for targeted advertising.

39.    The fr cookie will expire after 90 days unless the visitor's browser logs back into

---

[32] Data Protection Commissioner, Facebook Ireland Ltd, Report Of Re-Audit (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[33] Facebook, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/.
[34] *Id.*

1   Facebook.[35] If that happens, the time resets, and another 90 days begins to accrue.[36]

2      40.   Facebook, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and

3   corresponding Facebook profiles.

4      41.   A Facebook ID is personally identifiable information.  Anyone can identify a Facebook

5   profile-and all personal information publicly listed on that profile—by appending the Facebook ID to

6   the end of Facebook.com.

7      42.   By compelling a visitor's browser to disclose the c_user cookie alongside event data for

8   videos, Watch AFL knowingly discloses information sufficiently permitting an ordinary person to

9   identify a specific individual's video viewing behavior.

10   **IV.   Experience of Plaintiff Ian McCormick**

11      43.   In March 2023, Plaintiff McCormick purchased a digital subscription to Watch AFL in

12   order to watch pre-recorded videos.

13      44.   Since in or about 2008, Plaintiff McCormick has had a Facebook account.

14      45.   Plaintiff McCormick frequently visits Watch AFL to, among other things, watch and

15   pre-recorded videos.

16      46.   On information and belief, when Plaintiff McCormick watches pre-recorded videos on

17   www.watchafl.com.au, Watch AFL discloses to Facebook his Facebook ID, browser identifiers, and

18   other identifying information.

19      47.   On information and belief, when Plaintiff McCormick watches pre-recorded videos on

20   Watch AFL, Defendant discloses his event data, which includes the pages he views and the buttons he

21   clicks. This event data, which Watch AFL transmits through first-party cookies, is sufficient to identify

22   each video's title.

23      48.   Plaintiff McCormick discovered that Watch AFL surreptitiously collected and

24   transmitted his personally identifiable information in or about July 2024.

25   **V.   Experience of Plaintiff Josh Blakeley**

26      49.   In September 2022, Plaintiff Blakeley purchased a digital subscription to Watch AFL

27

28   [35] See Facebook, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/.
     [36]                                        Confirmable through developer tools.

1  in order to watch pre-recorded videos.

2       50.     Since in or about 2007, Plaintiff Blakeley has had a Facebook account.

3       51.     Plaintiff Blakeley frequently visits Watch AFL to, among other things, watch and pre-

4  recorded videos.

5       52.     On information and belief, when Plaintiff Blakeley watches pre-recorded videos on

6  www.watchafl.com.au, Watch AFL discloses to Facebook his Facebook ID, browser identifiers, and

7  other identifying information.

8       53.     On information and belief, when Plaintiff Blakeley watches pre-recorded videos on

9  Watch AFL, Defendant discloses his event data, which includes the pages he views and the buttons he

10  clicks. This event data, which Watch AFL transmits through first-party cookies, is sufficient to identify

11  each video's title.

12       54.     Plaintiff Blakeley discovered that Watch AFL surreptitiously collected and transmitted

13  his personally identifiable information in or about August 2024.

14       **TOLLING OF THE STATUTES OF LIMITATIONS**

15       55.     Each unauthorized transmission of Plaintiffs' and Class Members' Personally

16  Identifiable Information by Watch AFL is a separate unlawful act that triggers anew the relevant statute

17  of limitations.

18       56.     Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent

19  concealment doctrine based on Defendants' knowing and active concealment and denial of the facts

20  alleged herein including but not limited to their incorporation of the tracking pixels and devices; and

21  (2) the delayed discovery doctrine, as Plaintiffs and Class Members did not and could not reasonably

22  have discovered Defendants' conduct alleged herein until shortly before the filing of this Complaint.

23  Plaintiffs and Class Members did not discover and could not reasonably have discovered that

24  Defendants were disclosing and releasing their Personally Identifiable Information in the ways set forth

25  in this Complaint until shortly before this lawsuit was filed in consultation with counsel.

26       57.     The Meta Pixel, and other tracking tools on Watch AFL's website, were and remain

27  entirely invisible to a website visitor.

28       58.     Through no fault of their own or lack of diligence, Plaintiffs and Class Members were

deceived and could not reasonably discover Defendants' unlawful conduct. Defendants' Privacy Policy does not inform Defendants' customers that their Personally Identifiable Information will be disclosed to unauthorized third parties such as Meta as described in this Complaint.

59.     Plaintiffs were therefore ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

60.     Defendants have and had exclusive knowledge that Watch AFL's website incorporates the Meta Pixel, and other tracking tools, and the information those pixels and tools are configured to collect and disclose, and yet Defendants failed and continue to fail to disclose to website visitors, including Plaintiffs and Class Members, that by interacting with Watch AFL's website their PII would be disclosed to, released to, or intercepted by Meta and other unauthorized third parties.

61.     Under the VPPA, Defendants were and continue to be under a duty to disclose the nature, significance, and consequences of their collection and treatment of website visitors' and customers' PII. However, to date, Defendants have not conceded, acknowledged, or otherwise indicated to Watch AFL's customers and other website visitors that Watch AFL has disclosed or released their PII to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

62.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ACTION ALLEGATIONS

63.     Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 ("Rule 23").

64.     Pursuant to Rule 23, Plaintiffs seek to represent the following Class (members of which are collectively referred to herein as "Class Members"):

> All persons in the United States who subscribe or who have subscribed to Watch AFL and, while having a Facebook account, viewed prerecorded video content on www.watchafl.com.au during the time the Meta Pixel was active on www.watchafl.com.au.

65.     Excluded from the Class are Defendants, their employees, agents and assigns, and any

members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

66.     Plaintiffs reserve the right to revise or amend the above Class definition based on the discovery of new information.

67.     This action has been brought and may be properly maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiffs are proper representatives of the Class.

68.     **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Class, as defined and identified herein, are, on information and belief, more than one thousand, and so numerous that joinder of all members of the Class is impracticable.

69.     **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have been subscribers to Watch AFL since 2023, they used Watch AFL's website to view pre-recorded videos on the same personal computer they used to access Meta and, as a result, their PII was disclosed to Meta.

70.     **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members these common questions include but are not limited to:

(a)     Whether Defendants, through Watch AFL, are engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

(b)     Whether Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(c)     Whether Watch AFL had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

(d)     Whether Class Members' information collected, disclosed, and shared by Watch AFL with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(e)     Whether Watch AFL obtained "informed, written consent" from Class Members

within the meaning of 18 U.S.C. § 2710(b)(2)(b) and meets the requirements of that subsection; and

(f)    Whether Watch AFL's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq*.

71.    **<u>Adequacy of Representation (Rule 23(a)(4))</u>:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with those of Class Members, they have no conflict of interest with other Class Members, are not subject to any unique defenses, and have retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of other Class Members. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Plaintiffs and their counsel anticipate no difficulty in managing the litigation of this as a class action.

72.    **<u>Predominance and Superiority (Rule 23(b)(3))</u>:** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendants, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation.

Plaintiffs anticipate no difficulty in the management of this action which would preclude its maintenance as a class action.

73.     Plaintiffs reserve the right to add representatives for the Class, provided Defendants are afforded an opportunity to conduct discovery as to those representatives.

### FIRST CAUSE OF ACTION

***Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.***

74.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

75.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

76.     Watch AFL is "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

77.     Plaintiffs and Class Members are "consumers" because they are "subscribers" to Watch AFL's services, each having agreed to pay a weekly, monthly, or annual amount to access Watch AFL's live-streaming events and its library of pre-recorded videos, a service Watch AFL describes as a "subscription."[37] 18 U.S.C. § 2710(a)(1).

78.     Watch AFL discloses "personally identifiable information" of Plaintiffs and other Class Members to Meta, and, on information and belief, other unauthorized third parties, because Watch AFL sends "information which identifies a person as having requested or obtained specific video materials" from Watch AFL, 18 U.S.C. § 2710(a)(3), specifically the title and/or identity of every video watched alongside information that would allow the recipients of the information Watch AFL sends, and an ordinary person, to identify the user.

79.     Watch AFL does not seek, let alone receive, "informed, written consent" from Plaintiffs

---

[37]  *See* https://www.watchafl.com.au/ (Last visited August 5, 2024)

and other Class Members, 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent, 18 U.S.C. § 2710(b)(2)(iii).

80.     Watch AFL provides Plaintiffs' and Class Members' PII to Meta, and, on information and belief, other unauthorized third parties, knowingly. In particular, Watch AFL installed, embedded, and/or otherwise permitted the presence of the Meta Pixel, on its website and knew that this pixel and tracking tool would gather and disclose the titles and/or identities of prerecorded videos watched by Plaintiffs and Class Members.

81.     By knowingly disclosing Plaintiffs' and other Class Members' personal viewing content, Watch AFL violates Plaintiffs' and other Class Members' statutorily protected rights to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

82.     As a result of the above-described violations, Watch AFL is liable to Plaintiffs and other Class Members for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Watch AFL is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Watch AFL in the future.

83.     Plaintiffs, on behalf of themselves and the Class, seeks relief as further described below.

**PRAYER FOR RELIEF**

Plaintiffs on behalf of themselves and other Class Members prays for judgment against Defendants as follows:

84.     An order certifying the Class as requested herein;

85.     An order appointing Plaintiffs Ian McCormick and Josh Blakeley as Class Representatives;

86.     An order appointing the undersigned attorneys as Class Counsel;

87.     An order awarding Plaintiffs and Class Members statutory damages of no less than $2,500 per Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.;

88.     An injunction forbidding Defendants from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

89.     An award of reasonable attorneys' fees and costs of suit, including costs of investigation;

90.     An award of pre- and post-judgment interest as provided by law; and

91.     An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all other members of the Class, hereby demands a jury trial on all issues so triable.


Respectfully submitted,

Dated: August 9, 2024          ___/s/ Julian Hammond_____

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pblandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

*Attorneys for Plaintiffs and the Putative Class*